IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

LESLIE B. JACOB,

      Plaintiff,

                                Civil Action 2:12-cv-253
  v.                          Judge Michael H. Watson
                                  Magistrate Judge Elizabeth P. Deavers

COMMISSIONER OF SOCIAL SECURITY,

      Defendant.

## REPORT AND RECOMMENDATION

Plaintiff brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for social security disability insurance benefits.[1]  This matter is before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors, the Commissioner's Memorandum in Opposition to Plaintiff's Statement of Errors, Plaintiff's Reply brief, and the administrative record.  (ECF Nos. 9, 11, 12 and 8.)  For the reasons that follow, it is **RECOMMENDED** that Plaintiff's Statement of Errors be **OVERRULED** and that the Commissioner's decision be **AFFIRMED**.

## I.  BACKGROUND

Plaintiff filed her application for benefits on February 28, 2008, alleging that she has been disabled since December 31, 2007, at age 50.  (R. at 121, 131.)  Plaintiff's date of last insured ("DLI") was March 31, 2010.  (R. at 17.)  Plaintiff alleges disability as a result of bipolar disorder; arthritis, sciatica, fibromyalgia, and posttraumatic stress disorder ("PTSD").  (R. at

---

[1] Although Plaintiff alleges in her Complaint that she applied for both disability benefits and supplemental security income, (Compl. ¶ 4, ECF No. 3), the record contains only an application for disability benefits.  (R. at 121.)

135.) Plaintiff's applications were denied initially and upon reconsideration. Plaintiff sought a *de novo* hearing before an administrative law judge ("ALJ"). ALJ John R. Montgomery held a hearing on September 9, 2010, at which Plaintiff, represented by counsel, appeared and testified. (R. at 37-77.) Richard Oestreich, a Vocational Expert, also appeared and testified at the hearing. (R. at 64-77.) On March 1, 2011, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. at 15-36.) On January 20, 2012, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision. (R. at 1-3.) Plaintiff thereafter timely commenced the instant action.

## II. HEARING TESTIMONY

### A. Plaintiff's Testimony

During the September 9, 2010 administrative hearing, Plaintiff testified that she lives in a house with her husband and two children, ages fifteen and eighteen. (R. at 42.) She indicated that she and her husband were in the midst of getting divorced. She testified that she drives when she has to, such as to the store to get milk. She also drove herself to the hearing that day. *Id.*

Plaintiff testified that she has a high school diploma, and that she has received a certificate from a vocational school which allowed her to work as a travel agent in the past. (R. at 43.) Plaintiff stated that she has not worked nor looked for work since 2007. (R. at 44.) She last worked as a supervisor at a drug store. She testified that she quit that job because it required lifting and because she did not get along with anyone, including her manager. (R. at 44.) Prior to that Plaintiff worked as a manager at a hardware store.

Plaintiff testified that she is unable to work due to bipolar, depression, PTSD and agoraphobia.  (R. at 48.)  She stated that she experiences days in which she cries all day.  She testified that although she had not experienced a manic episode in a few months, she has had manic episodes that last anywhere from fifteen minutes to a week.  Plaintiff testified that, in the week prior to the hearing, she experienced two full days in which she cried all day.  She stated that she has bipolar depression and situational depression due to her impending divorce.  Plaintiff denied avoiding people besides her husband.  She stated that she has always had a problem getting along with coworkers.  (R. at 50.)

Plaintiff testified that rather than eat meals she drinks smoothies made from fresh fruits and vegetables.  (R. at 53.)  She stated that she prepares the smoothies herself using fresh ingredients.  She also reported that she watches television during the day.  (R. at 54.)  She testified that she has experienced problems with her memory in the "few months" prior to the hearing.  *Id.*  She described bouts of agoraphobia, which cause her to not want to go to the store. (R. 58.)  She estimated that she remained indoors seven months out of the previous year.  (R. at 58.)  She stated that she does not take her dog for walks.  (R. at 61.)

Plaintiff testified that she went to Florida the March prior to the hearing date.  (R. at 62.) She stated that although she did not experience symptoms related to her condition during her trip, her doctor said that a lack of symptoms during vacation is normal.  (R. at 62.)

**B.	Vocational Expert Testimony**

Richard Oestreich, Ph.D. testified at the administrative hearing as the vocational expert ("VE").  (R. at 64.)  Dr. Oestreich classified Plaintiff's past work experience as medium unskilled, light and semiskilled, and unskilled light.  (R. at 65.)  The ALJ asked the VE to

3

assume an individual had a series of hypothetical limitations. He asked the VE to assume that a person with Plaintiff's education was physically limited in a number of ways. He asked the VE to further assume that the person was limited to simple, repetitive tasks that would be performed in a low-stress environment. Specifically, the environment would include no strict production quotas, no strict time requirements, and infrequent and superficial contact with others. (R. at 66.) The VE indicated that the most significant issue with Plaintiff being able to perform her past work under those circumstances would be the inability to have contact with others. He nevertheless concluded that Plaintiff could still perform her past relevant work experience of retail clerk or deli clerk, because contact with others would be superficial. *Id.* The ALJ asked the VE to further assume that Plaintiff could have very little contact with others. The VE responded that she would be unable to perform her past work experience with that restriction. He testified, however, that she would be able to perform jobs that exist in the local and national economy with those restrictions. (R. at 67.) As examples, he testified that Plaintiff could work as an inspector, assembler or housekeeper. *Id.* The VE stated that if Plaintiff were required to miss more than one day per month, she would not be able to compete in the workforce. (R. at 68.)

### III. MEDICAL RECORDS[3]

**A.      Pre-DLI Medical Records**

**1.      Robert H. Perkins, M.D.**

Although Dr. Perkins treated Plaintiff for numerous physical impairments, he also made various notations throughout his records that bear on Plaintiff's mental health condition. For

---

[2] In her Statement of Errors, Plaintiff does not challenge the Commissioner's findings with respect to her alleged physical impairments. Accordingly, the Court will focus its review of the evidence on Plaintiff's alleged mental impairments.

4

example, on January 14, 2008, Dr. Perkins  noted that Plaintiff "is walking on a regular basis . . .
[s]he has three dogs she has to walk."  (R. at 213.)  On February 15, 2008, Dr. Perkins noted that
Plaintiff reported being "much more active around the house and [being able] to work around the
house."  (R. at 208.)

###        2.        Scott Merryman, M.D.

Dr. Merryman is Plaintiff's family physician.  The earliest office note contained in the
record is dated February 12, 2007.  (R. at 253.)   Dr. Merryman noted bipolar as a possible mood
disorder, but without recent mania.  Plaintiff reported her sleep as "fine," and that her anxiety
was well-controlled.

Plaintiff visited Dr. Merryman again on July 2, 2007.  (R. at 251.)  She reported feeling
happy at work and that she likes to help people.  She stated that her job requires a lot of physical
activity.  When she gets in her car to drive home, however, she reported that her attitude
becomes negative.  Plaintiff also reported experiencing marital problems for the last three years,
which she characterized as a "big issue."  *Id.*  Dr. Merryman's notes indicate that Plaintiff could
not respect her husband due to allegations that he sexually abused her daughter.  Plaintiff
described her relationship with her kids as "good."  *Id.*  She and her husband get into yelling-
arguments a lot.  She said she is fine when he is not home.  Dr. Merryman noted an absence of
unpredictable or inappropriate mood changes.  He also noted a lack of observed mania.  For
assessments, Dr. Merryman noted a history of bipolar disorder and recent depression.

Plaintiff visited Dr. Merryman on October 4, 2007.  (R. at 249.)  She reported being
"very tired lately," and that "work is bad and she feels like she needs to act like she is happy
there."  *Id.*  She reported that she "always feels anxious."  *Id.*  She further stated that has been

5

sleeping "fair." *Id.* Dr. Merryman noted that Plaintiff was "recently always anxious," and "worried," but that it was "work related probably." *Id.* Plaintiff stated that she does not know how to deal with people. She reported troubles at work, and was "tearful briefly" during the appointment. *Id.*

Dr. Merryman saw Plaintiff on October 20, 2007. (R. at 247.) Plaintiff reported that she was sleeping okay usually, but good overall. She stated that her energy, depression and anxiety were "better." *Id.* She also reported that "last week was pretty good," and that she "laughed a lot with kids." *Id.*

Dr. Merryman saw Plaintiff again on December 6, 2007, at which time she reported feelings of guilt and worthlessness. (R. at 245.) She also indicated feeling lethargic, irritable and agitated. She denied feeling hyper, but reported thoughts of suicide. Dr. Merryman noted Plaintiff's affect as "good," but noted reports of slow concentration. *Id.* His assessments included bipolar and worsening depression. (R. at 246.)

Plaintiff saw Dr. Merryman again on February 16, 2008. (R. at 276.) She reported feeling bad about herself, down and depressed, and hopeless. She also reported having little energy and interest in doing things. Plaintiff denied current suicidal thoughts or thoughts of hurting others. She stated she has difficulty concentrating, falling asleep and staying asleep. Plaintiff also reported severe depression. Dr. Merryman noted her mood as normal but depressed. He reported diagnoses of bipolar disorder and general anxiety. (R. at 277.)

Plaintiff again saw Dr. Merryman on March 8, 2008. (R. at 273.) Plaintiff reported "[n]ot as much depression but some." *Id.* She stated that at times she has memory problems.

She reported experiencing manic days approximately 20% of the time.  She has had few normal days.  She reported enjoying playing with her kids and watching movies with them.

Plaintiff next saw Dr. Merryman on April 7, 2008.  (R. at 271.)  She reported that she had not slept well in the three days prior.  She reported racing and "horrible" thoughts that resembled obsessions more than mania.  She reported that her concentration is okay most of the time, and that she carries out activities most of the time.

Plaintiff saw Dr. Merryman again on June 5, 2008.  (R. at 268.)  She reported feeling depressed with very few moments of happiness.  She stated that she can force herself to look happy, but she thinks too much about "sad stuff." *Id.*  Plaintiff stated that she thinks about suicide, but stated she "can't do it because of her kids." *Id.*  She stated that usually her thoughts last only a couple minutes.  Plaintiff reported getting more exercise than usual.  Dr. Merryman noted his belief that Plaintiff's "marriage and it[s] issues" contribute to the way she is feeling.

Plaintiff saw Dr. Merryman on June 23, 2008.  (R. at 265.)  Plaintiff reported that she feels like crying a lot, and that her anxiety and sadness were both still present.  She reported sleeping better.  She denied manic symptoms and suicidal thoughts.  Dr. Merryman reported that Plaintiff was tearful at times.  He stated that she looks sad and anxious because she was caught filling prescriptions from two different doctors at two different pharmacies, which is prohibited.

Plaintiff next saw Dr. Merryman on July 26, 2008.  (R. at 262.)  Plaintiff reported that her anxiety has increased at times.  Plaintiff reported her mood as okay, but noted that a long-time friend of hers had died the week before.  (R. at 263.)  Plaintiff denied recent bouts of mania.  Dr. Merryman cautioned her that she was not on a mood stabilizer (due to cost), which posed a risk

7

of mania.  Plaintiff reported poor daily functioning with low motivation.  Plaintiff stated that she does not feel she can work due to mood and anxiety issues.

Plaintiff saw Dr. Merryman again on August 8, 2008.  (R. at 260.)  Plaintiff reported her energy and mood as "better," and that she had been sleeping "good."  She indicated that she was getting things done and functioning well, which caused her to wonder if she is manic.  Dr. Merryman doubted that she was, noting "I suspect that she may just be feeling normal."  (R. at 260-61.)  Plaintiff reported that she "enjoys her parenting job and things are going well."  (R. at 261.)

Plaintiff next saw Dr. Merryman on October 11, 2008.  (R. at 258.)  She described her last month as "even" with no crying spells.  *Id.*  She reported that she has been trying to talk respectfully to her husband, which has helped.  She previously treated him in a mean way due to allegations of sexual abuse concerning her daughter.  Plaintiff reported her interactions with others as fine, and stated that she enjoys most activities with her kids.  Dr. Merryman noted that Plaintiff's general anxiety disorder was well-controlled.  He noted that her borderline features have lessened.

Plaintiff visited Dr. Merryman on February 2, 2009.  (R. at 365.)  She reported more difficulty sleeping due to running out of medication.  She stated that she has less motivation and interest as well since running out of medication.  She stated she was under stress because her former friend has been calling while intoxicated and screaming at her.  Otherwise, Plaintiff reported that "the home situation is about the same."  (R. at 365.)  She stated that she enjoys her kids activities on a regular basis.  Dr. Merryman noted that Plaintiff's general anxiety disorder is under "pretty good control" with a new medication.

8

Plaintiff saw Dr. Merryman again on April 2, 2009.  (R. at 359.)  She reported that she has been sleeping okay, but that her mood has been "less than happy lately."  (R. at 360.)  Although she has gone outside sometimes, she has trouble making herself leave the house.  She reported feeling that she has no purpose and nowhere to go.  She denied having friends.  She reported that she may start to walk her dogs one at a time because they recently knocked her down during a walk.  Plaintiff denied thoughts of suicide.  She stated that she has not sought counseling in some time.

Plaintiff next saw Dr. Merryman on June 1, 2009.  (R. at 357.)  Plaintiff reported having some counseling, but stated that she has not found it to be helpful.  She stated that she continues to have negative thoughts that she cannot get out of her mind.  She stated that she is "better about going out now."  (R. at 357.)  She reported that she goes out more in spring and summer but less during the winter months.  She stated that she fears something terrible will happen to her or her children.  She reported having a good relationship with each of her children.  Plaintiff stated that she thought she may have experienced manic symptoms recently because she was up until 4:00 a.m.  She stated she has racing thoughts of "what ifs?".  Dr. Merryman noted that "[s]ome of this relates to marital situation and sounds like a normal consequence of the past marital issues."  (R. at 358.)  He noted that he is "not convinced that she really is bipolar."  (R. at 358.)  He indicated that obsessive compulsive disorder and anxiety are "big issues now."  *Id.*

Plaintiff saw Dr. Merryman again on July 11, 2009.  (R. at 354.)  Plaintiff reported that her mood had been depressed, partly due to instances in which she tripped or fell down, but it "has improved some."  (R. at 355.)  She stated that she has been waking up at night and cleaning

for a number of days. She believes this constitutes manic episodes, and also reported feeling

hyper and talking fast and loud.

Plaintiff again saw Dr. Merryman on September 14, 2009. (R. at 351.) She reported

feeling less anxious, and stated that things "are going better at home." *Id.* She indicated that her

children are getting up and going to school with less trouble, which helps the rest of the day go

smoother. She reported seeing a counselor a total of four times in the prior six months, but said

she thinks she needs to see someone else. She reported having difficulty getting over the issues

of sexual abuse related to her husband and daughter. Dr. Merryman noted that he "think[s] she

has problems that are quite logical and relate to the marriage and the previous sexual abuse of

[her daughter] by her husband." (R. at 352.) He stated that Plaintiff "cannot get over this, which

is understandable." *Id.* He noted the importance of counseling, stating that it is more important

than medication for her at this point. *Id.*

Plaintiff next saw Dr. Merryman on October 29, 2009. (R. at 348.) Plaintiff reported that

she has experienced periods in which she cannot sleep and is "running around in the middle of

the night cleaning." *Id.* She reported racing thoughts, crying, and moodiness over the previous

months. She thinks these episodes may be related to the fact that her daughter has moved back

in, "which has promoted chaos." (R. at 349.) Plaintiff stated that she has an appointment to

meet with a new counselor the following month. Dr. Merryman noted that Plaintiff's depression

and anxiety are worse, and that she may be manic.

Plaintiff saw Dr. Merryman on November 14, 2009. (R. at 346.) She reported better

sleep and relaxation with the increased dose of medication she was given during her last visit.

She reported that she still worries a lot. She stated that she has seen her new counselor twice.

She reported feeling more energy in the daytime, and that her focus and concentration were okay. She indicated that she "enjoys things briefly with the kids." (R. at 347.) She reported difficulty getting outside without fear and anxiety unless one of her kids accompanies her.

Plaintiff saw Dr. Merryman again on December 26, 2009. (R. at 344.) She stated that she and her family played board games that they received as Christmas gifts. She indicated that her children have not been treating her nicely. She reported memory problems, including instances in which she would forget conversations and shopping trips that she had. She reported experiencing less sadness. (R. at 345.) She naps 1-2 hours per day while the kids are at school.

### 3.      Frank Orosz, Ph.D./ Dr. Nick Alberts

Dr. Frank Orosz reviewed Plaintiff's medical records on behalf of the state agency on June 2, 2008. (R. at 309-334.) Dr. Orosz noted that Plaintiff is alleged to suffer from bipolar disorder and PTSD. (R. at 325.) In terms of daily activities, he noted previous reports by Plaintiff that she takes care of her children. She gets them up and off to school. She also cares for three dogs and three cats. Although she stated that some days she has problems leaving her house, other days she is fine. She reported that she shops for groceries, does chores, watches television, and reads. She gardens in the summer, and spends time on the computer. (R. at 325.)

Dr. Orosz also noted Plaintiff's reports that she gets so depressed three to four days per month that she does not want to get out of bed. She reported uncontrolled manic phases in which she could not control her spending. She reported that these phases are more controlled recently, but that she still has issues managing money. She reported difficulty "being under people's control." (R. at 325.)

11

Based on his review of the records, Dr. Orosz concluded that Plaintiff is moderately limited in the areas of being able to understand and remember detailed instructions, and carrying out detailed instructions. Other than that, Dr. Orosz determined that Plaintiff suffers no significant limitations. (R. at 323-26.)

In January 2009, Dr. Nick Alberts affirmed Dr. Orosz's assessment. (R. at 78.)

### 4. Mount Carmel Hospital

Plaintiff presented to the emergency room at Mount Carmel Hospital on March 24, 2010. (R. at 375.) She complained of anxiety. She stated that she and her husband had gotten into a fight the night previous night and she flushed her medication down the toilet.[2] Plaintiff was described as presenting "very anxious and tearful." *Id.* She denied suicidal thoughts.

### B. Post-DLI Medical Records

### 1. Scott Merryman, M.D.

The record reflects that Plaintiff next saw Dr. Merryman on April 10, 2010. (R. at 448.) She reported that she took a trip to Florida in late February of that year. (R. at 449.) She reported the trip as "good." *Id.* She and her husband talked about separating, but decided they cannot afford to live separately. Plaintiff indicated that they have been going to counseling for the past three weeks. Plaintiff stated that she has been manic for the last week and half. Dr. Merryman, however, noted that "she does not seem manic here today." *Id.* Plaintiff reported that she had not been pursuing individual counseling. Dr. Merryman noted Plaintiff's maritial issues as "the biggest factor" to her symptoms.

---

[2] The hospital records indicate that Plaintiff threw out her medication three days earlier. (R. at 376.)

Plaintiff next saw Dr. Merryman on May 21, 2010. (R. at 446.) She reported that she enjoys activities with her youngest son, and that she does mostly cleaning but it is difficult to clean around all the animals. (R. at 447.) She reported feeling sad and crying daily.

Plaintiff saw Dr. Merryman again on June 9, 2010. (R. at 443.) She reported that her medication has helped her to "remain calm and functional." (R. at 444.) She stated that her energy and mood are better. Dr. Merryman noted that her "[a]nxiety and worrying are big problems now and a lot of it is situational." *Id.* Plaintiff stated that she "is not sure that she wants [her marriage] to continue which complicates things and she is not sure that she could survive financially on her own." *Id.*

Plaintiff saw Dr. Merryman on July 2, 2010. (R. at 441.) Plaintiff indicated that she had not been managing things very well lately. She discovered that her husband has been having an affair. She is considering divorce but indicated that the financial aspect is the "biggest issue" of concern. *Id.*

On August 19, 2010, Dr. Merryman completed a Medical Statement for Social Security Disability Claim. (R. at 486-490.) In the statement, he noted that Plaintiff suffers from frequent loss of interest in activities; appetite disturbance; sleep disturbance; decreased energy; feelings of worthlessness; and difficulty concentrating or thinking. He noted that her manic symptoms had been infrequent that year. (R. at 486.) He further noted that Plaintiff suffers from generalized persistent anxiety; motor tension; apprehensive expectation; and recurrent obsessions or compulsions causing marked distress. (R. at 487.) He denied that Plaintiff had suffered recent panic attacks and stated that "agoraphobia is a problem at times." *Id.* He opined that Plaintiff suffers no restrictions in daily activities, and moderate restrictions in maintaining social

13

functioning. *Id.* He noted by checking boxes on the standard form, without elaboration, deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner, as well as repeated episodes of deterioration or decompensation. (R. at 488.) He found Plaintiff to suffer marked impairment with respect to the following abilities: remember locations and work-like procedures; understand and remember detailed instructions; carry-out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule; work with others; make work-related decisions; accept instruction and respond to criticism; get along with coworkers; respond to changes in work setting; travel to unfamiliar places or use public transportation; and set realistic goals. (R. at 488-90.) He found Plaintiff to be moderately impaired in all other categories, except he found no significant impairment in her ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. *Id.*

On September 22, 2010, Dr. Merryman authored a letter to the ALJ, in which he set forth his credentials with respect to the field of psychiatrics. (R. at 497.) Dr. Merryman stated that he had been in family medicine for thirty years, with a practice "heavily weighted" toward behavioral medicine or psychiatric cases. *Id.* Dr. Merryman also indicated that he had been teaching behavioral medicine and patient communications at The Ohio State University ("OSU") Family Medicine Department at the OSU College of Medicine for the previous ten years. He further indicated that he had been the Co-Director of the Behavioral Medicine Curriculum for the OSU Family Medicine Residency for the previous five years. Finally, Dr. Merryman stated that he participates in "psychopharmacology consult patient visits" with residents at the medical school as part of their education in psychiatry. *Id.*

14

## 2.      Robert H. Perkins, M.D.

Plaintiff reported to Dr. Perkins, her pain management doctor, on July 21, 2010 that she was "very happy . . . as she is able to function more and she is able to do her activities of daily living around the house including cleaning at times."  (R. at 460.)

## IV.  THE ADMINISTRATIVE DECISION

On March 1, 2011, the ALJ issued his decision.  (R. at 12-36.)  At step one of the sequential evaluation process,[3] the ALJ found that Plaintiff had not engaged in substantial gainful activity since December 31, 2007, the alleged onset date.  (R. at 17.)  At step two, the ALJ concluded that Plaintiff had the severe impairments of degenerative disc disease lumbar spine; fibromyalgia; bipolar disorder; and generalized anxiety disorder.  *Id.*  At step three, the ALJ further concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. at 18.)  The ALJ evaluated Plaintiff's residual functional capacity ("RFC") at step four of the sequential evaluation process as follows:

---

[3] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.  *See* 20 C.F.R. § 416.920(a)(4).  Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1.      Is the claimant engaged in substantial gainful activity?
2.      Does the claimant suffer from one or more severe impairments?
3.      Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4.      Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5.      Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

> After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) but with no more than occasional stooping.  Mentally, the claimant was further limited to simple repetitive tasks in a low stress environment defined as no fast paced work and no strict time requirements; and only infrequent and superficial contact with others.

(R. at 21.)  In reaching this determination, the ALJ concluded that Plaintiff suffers from an underlying medically determinable impairment that could reasonably cause some of the symptomology alleged.  (R. at 22.)  The ALJ found, however, that the "record does not disclose sufficient objective medical evidence to substantiate the severity of the symptoms and degree of functional limitations alleged by [Plaintiff]."  *Id.*  He found that "[w]hile the record indicates that the claimant had some mental impairments, there is no compelling evidence that she could not perform the mental demands of work as set forth [in the RFC]."  (R. at 25.)  Further, in reaching this conclusion, the ALJ afforded "little weight" to the August 19, 2010 medical statement of Dr. Merryman.  (R. at 27.)  The ALJ stated that although "Dr. Merryman is a treating source[,] he is a specialist in family practice rather than psychiatry, although he has reported that his practice is heavily weighted in behavioral medicine or psychiatric cases."  *Id.*  The ALJ further elaborated as follows:

> Nonetheless, [Dr. Merryman's] opinion has been considered, but must be discounted for a number of reasons.  Most significantly, it is not supported by and is inconsistent with the greater weight of the medical evidence in this record.  The assessment appears to express the claimant's own allegations as to her disability rather than the doctor's own findings.  The marked limitations conflict with the source's own internal records as discussed [earlier in the ALJ's decision].  His records generally show that the claimant's mental health was fairly controlled prior to the date last insured, when she took her medications as prescribed.
> . . .
> In assessing statements from treating sources, the possibility always exists that a doctor may express an opinion in an effort to assist a patient with whom he or she may sympathize for one reason or another.  Another reality that should be mentioned is that patients can be quite insistent and demanding in seeking supportive notes or reports from their physicians, who might provide such a note

> in order to satisfy their patients' request and avoid unnecessary doctor/patient tension.  While it is difficult to confirm the presence of such motives, they are more likely in situations where the opinion in question departs substantially from the rest of the evidence of record, as in the current case.  Regardless, full credit cannot be given to these statements regarding the claimant functional ability when the clinical notes are at odds with the assessments.

(R. at 27-28.)  The ALJ next determined that Plaintiff was unable to perform any past relevant work through the date of her DLI, which was March 31, 2010.  (R. at 28.)   Finally, relying on the VE's testimony, the ALJ concluded that there exist jobs in significant numbers in the local and national economy that Plaintiff can perform.  (R. at 29.)  Consequently, he concluded that Plaintiff was not disabled within the meaning of the Social Security Act prior to the DLI.  (R. at 30.)

## V.  STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. at 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. at 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial.  The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the

Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Univ. Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'"  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VI. LEGAL ANALYSIS

Plaintiff raises a single challenge to the ALJ's decision.  Specifically, she contends that the ALJ committed reversible error in failing to accord greater deference to the opinion of her treating physician, Dr. Merryman, concerning her mental limitations.  The Undersigned disagrees and concludes that substantial evidence supports the ALJ's decision.

### A.     Treating Physician's Opinion

The ALJ must consider all medical opinions that he or she receives in evaluating a claimant's case.  20 C.F.R. § 416.927(d).  The applicable regulations define medical opinions as "statements from physicians . . . that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."  20 C.F.R. § 416.927(a)(2).

The ALJ generally gives deference to the opinions of a treating source "since these are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone . . . ."  20 C.F.R. § 416.927(d)(2); *Blakley*, 581 F.3d at 408.  If the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the claimant's] case record, [the ALJ] will give it controlling weight."  20 C.F.R. § 404.1527(d)(2).

If the ALJ does not afford controlling weight to a treating physician's opinion, the ALJ must meet certain procedural requirements.  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).  Specifically, if an ALJ does not give a treating source's opinion controlling weight:

> [A]n ALJ must apply certain factors—namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source—in determining what weight to give the opinion.

*Id.*

Furthermore, an ALJ must "always give good reasons in [the ALJ's] notice of determination or decision for the weight [the ALJ] give[s] your treating source's opinion."  20 C.F.R. § 416.927(d)(2).  Accordingly, the ALJ's reasoning "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."  *Friend v. Comm'r of Soc. Sec.*, No. 09-3889, 2010 WL 1725066, at *7 (6th Cir. 2010) (internal quotation omitted).  The United States Court of Appeals for the Sixth Circuit has stressed the importance of the good-reason requirement:

> "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases," particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir.1999). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule. *See Halloran v. Barnhart*, 362 F.3d 28, 32–33 (2d Cir. 2004).

*Wilson*, 378 F.3d at 544–45. Thus, the reason-giving requirement is "particularly important when the treating physician has diagnosed the claimant as disabled." *Germany-Johnson v. Comm'r of Soc. Sec.*, 312 F. A'ppx 771, 777 (6th Cir. 2008) (citing *Rogers*, 486 F.3d at 242).

Finally, the Commissioner reserves the power to decide certain issues, such as a claimant's residual functional capacity. 20 C.F.R. § 404.1527(e). Although the ALJ will consider opinions of treating physicians "on the nature and severity of your impairment(s)," opinions on issues reserved to the Commissioner are generally not entitled to special significance. 20 C.F.R. § 404.1527(e); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007).

**B.    Application**

The ALJ did not err in according little weight to the opinion of Plaintiff's treating physician, Dr. Merryman with respect to his determination as to Plaintiff's mental impairments and accompanying restrictions. First, in assessing the weight to accord Dr. Merryman's medical statement, the ALJ considered the appropriate factors as set forth in *Wilson*. For example, he noted that Dr. Merryman specializes in family practice rather than psychiatry. (R. at 27.) In doing so, he acknowledged that Dr. Merryman reported his practice as being heavily weighted toward behavioral medicine or psychiatric cases. *Id.* Nevertheless, the ALJ found Dr. Merryman's opinion to be inconsistent with, and unsupported by, the record as a whole. *Id.*

20

Perhaps most importantly, the ALJ concluded that Dr. Merryman's medical statement was inconsistent with and unsupported by Dr. Merryman's own treatment notes.  (R. at 27.) Specifically, although Dr. Merryman's medical statement reported that Plaintiff suffered marked impairment in the majority of the listed categories, his treatment notes paint a different portrait of Plaintiff's mental-health symptoms.  For example, Plaintiff often reported that she enjoyed engaging in activities with her children.  (R. at 258, 261, 273, 347, 344, 365, 447.)  She reported partaking in other activities, such as walking her dogs.  (R. at 359.)  In addition, particularly from August 2008 forward, Plaintiff often reported that she felt good.  *See* R. at 260 (Plaintiff reporting "better" energy and mood and "good" sleeping); 258 (reporting that her last month had been "even" with no crying spells); 354 (reporting an improved mood); 351 (reporting feeling less anxious, and stating that things at home had been better); 346 (reporting better sleep and increased relaxation); 345 (reporting feeling less sad).  In June 2009, Plaintiff reported that she is "better about going out now."  (R. at 357.)  That same month she stated that her medication helps her "remain calm and functional."  (R. at 444.)  Indeed, in October 2008, Dr. Merryman described Plaintiff's general anxiety disorder as "well[-]controlled."  (R. at 258.)  Likewise, in February 2009 he noted her general anxiety as being under "pretty good control."  (R. at 365.) When Plaintiff commented on her concentration after her alleged onset date, she generally reported it as being "okay."  (R. at 271, 347.)   In addition, Dr. Merryman repeatedly characterized the bulk of Plaintiff's problems as situational due to her failing marriage.  (R. at 268, 352, 358, 444.)  He also noted that he is "not convinced that she really is bipolar."  (R. at 358.)  Consequently, Dr. Merryman's medical statement is inconsistent with his treatment notes. As the ALJ recognized in according little weight to the medical statement, "[t]he assessment

appears to express [Plaintiff's] own allegations as to her disability rather than the doctor's own findings."  (R. at 27.)

The ALJ also found Dr. Merryman's medical statement to be inconsistent with Dr. Perkins' treatment notes.  For example, as the ALJ pointed out, on January 14, 2008, he noted that Plaintiff reported "walking on a regular basis."  (R. at 24, 213.)  She stated that she "has three dogs she has to walk."  (R. at 213.)  Similarly, on February 15, 2008 Plaintiff reported to Dr. Perkins that she had been "much more active around the house," and that she was able to complete household chores.  (R. at 208.)

Further, the ALJ concluded that Dr. Merryman's medical statement is inconsistent with the opinion of reviewing psychologist, Dr. Orosz.  Dr. Orosz concluded that Plaintiff suufers only moderate limitations in the areas of being able to understand and remember detailed instructions, and carrying out detailed instructions.  (R. at 323-26.)  Other than that, Dr. Orosz found that Plaintiff does not suffer significant limitations.  Moreover, according to the ALJ, Dr. Orosz is "well qualified because of training and experience in reviewing an objective record and formulating an opinion as to limitations."  (R. at 26.)  The ALJ also found Dr. Orosz's assessment to be "consistent with and well supported by the evidence of the record as a whole." *Id.*

Finally, the ALJ provided good reasons for giving less deference to Dr. Merryman's medical statement, as he is required to do under 20 C.F.R. § 416.927(d)(2) and *Wilson*.  As discussed above, the ALJ specifically referenced Dr. Merryman's specialty, as well as the inconsistencies and lack of supportability related to his medical statement, in determining how much weight to accord the opinion.  (R. at 27.)  Furthermore, although he stopped short of asserting that Dr. Merryman provided the medical statement out of sympathy or a need to avoid

tension in his relationship with Plaintiff, the ALJ indicated that such a possibility is more likely where a medical statement "departs substantially from the rest of the evidence of record, as in the current case." (R. at 27-28.)  In light of the foregoing, the Undersigned concludes that the ALJ did not err in failing to give greater deference to Dr. Merryman's medical statement.

Plaintiff's contrary arguments are not well taken.  First, Plaintiff contends that the ALJ failed to both assess the requisite factors and provide good reasons for according little weight to Dr. Merryman's medical statement.  As discussed above, however, the ALJ complied with the necessary procedural requirements in determining how much weight to assign the various medical opinions.  Second, Plaintiff contends that Dr. Orosz's opinion is less reliable than that of Dr. Merryman because it covers a far shorter time span.  (Reply 2, ECF No. 12.)  Dr. Orosz reviewed Plaintiff's treatment records on June 2, 2008.  (R. at 309.)  Dr. Merryman, as Plaintiff points out, treated Plaintiff through her DLI of March 31, 2010.  The ALJ specifically considered the timing of Dr. Orosz's review, however, and noted that "[t]he evidence received into the record after the reconsideration determination concerning the claimant's status did not provide any credible or objectively supported new and material information that would alter the State Agency's findings concerning the claimant's limitations."[4]  (R. at 26-27.)

Finally, the Undersigned concludes that substantial evidence supports the ALJ's decision. Dr. Merryman's treatment notes, as well as notations from Dr. Perkins' treatment notes,

---

[4] The parties also dispute the importance of the timing of Dr. Merryman's medical statement.  Dr. Merryman generated the medical statement on August 19, 2010, which was nearly five months after Plaintiff's DLI.  (R. at 486.)  Defendant asserts that Dr. Merryman's medical statement is thus beyond the realm of consideration.  (Op. 8, ECF No. 11.)  Plaintiff counters that although the statement was generated five months after her DLI, it constitutes "evidence of a continuing disability," rendering it appropriate for consideration.  (Reply 2, ECF No. 12.)  The Court need not determine the appropriateness of considering the medical statement in this case.  The ALJ considered the statement despite its timing, *see* R. at 27 (citing to the medical statement in assigning little weight to Dr. Merryman's opinion), and rejected it for the reasons set forth above.

combined with the opinion of state reviewing psychologist Dr. Orosz, constitute substantial evidence to support the ALJ's RFC determination with respect to Plaintiff's mental health.  Not only did Dr. Orosz conclude that Plaintiff is only moderately impaired in the two categories noted above, but the records of Dr. Merryman demonstrate that Plaintiff is relatively stable when taking her medication.  In making this determination, the Undersigned notes that Plaintiff cares for her children and her pets; cares for herself; finds enjoyment in activities; frequently reports positive progress to Dr. Merryman; has taken vacations; reports going to the grocery store on occasion; drives; and cleans her house.  In addition, as Dr. Merryman points out several times in his treatment notes, any issues Plaintiff experienced prior to her DLI related to her mood are best attributed to her troubled marriage rather than a permanent mental health condition.

Accordingly, the Undersigned concludes that the ALJ did not err in failing to accord greater deference to the medical statement of Dr. Merryman.  Furthermore, substantial evidence supports the ALJ's decision.  It is, therefore, **RECOMMENDED** that Plaintiff's Statement of Specific Errors be **OVERRULED** and that the Commissioner's decision be **AFFIRMED**.

## VII.  PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection.  28 U.S.C. § 636(b)(1);  Fed. R. Civ. P. 72(b).  Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and

waiver of the right to appeal the judgment of the District Court. *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation). Even when timely objections are filed, appellate review of issues not raised in those objections is waived. *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

Date: July 17, 2013                                      _____/s/ *Elizabeth A. Preston Deavers*
                                                         Elizabeth A. Preston Deavers
                                                         United States Magistrate Judge

25